**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

No. 23-2160

---

FIRST PROTECTIVE INSURANCE COMPANY,

Plaintiff – Appellee,

v.

LEWIS EDWARD O'LEARY; PROBUILDERS OF THE CAROLINAS, INC.,

Defendants – Appellants,

and

LINDA STOKES RIKE; WILLIAM SCOTT HEIDELBERG; HEIDELBERG AND MULLENS, INC.; RONALD PAUL HICKS; STORMPRO PUBLIC ADJUSTERS, LLC,

Defendants.

---

Appeal from the United States District Court for the Eastern District of North Carolina, at Greenville. Louise W. Flanagan, District Judge. (4:22-cv-00042-FL)

---

Argued:  March 20, 2025                          Decided:  July 15, 2025

---

Before WILKINSON, GREGORY, and QUATTLEBAUM, Circuit Judges.

---

Affirmed and remanded by unpublished opinion. Judge Quattlebaum wrote the opinion, in which Judge Wilkinson joined. Judge Gregory wrote a dissenting opinion.

---

2

**ARGUED:** Richard William Farrell, THE FARRELL LAW GROUP, P.C., Raleigh, North Carolina, for Appellants. Mihaela Cabulea, BUTLER WEIHMULLER KATZ CRAIG, LLP, Tampa, Florida, for Appellee. **ON BRIEF:** L. Andrew Watson, BUTLER WEIHMULLER KATZ CRAIG LLP, Charlotte, North Carolina, for Appellee.

———————————

Unpublished opinions are not binding precedent in this circuit.

QUATTLEBAUM, Circuit Judge:

Are impartial umpires who determine appraisal disagreements entitled to arbitral immunity under North Carolina law? Because we see nothing in North Carolina law suggesting the answer is yes, we affirm the district court's denial of a motion for judgment on the pleadings alleging absolute arbitrator immunity.

## I.

This case arises out of a home insurance coverage dispute between Linda Rike and her home insurer, First Protective. As alleged, in October 2019, Rike submitted a claim for damage caused by a toilet supply line leak. When Rike and First Protective couldn't agree on an appraisal of the damage for this claim, Rike invoked the policy's appraisal provision. That provision says:

> If you and we fail to agree on the value of any item or loss, either may demand an appraisal of such item or loss. In this event, **each party will choose a competent and disinterested appraiser** within 20 days after receiving a written request from the other. **The two appraisers will choose a competent and impartial umpire.** If they cannot agree upon an umpire within 15 days, you or we may request that a choice be made by a judge of a court of record in the state where the "residence premises" is located. The appraisers will separately set the amount of loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will set the amount of loss. Each party will:
>
> 1.    Pay its own appraiser; and
>
> 2.    Bear the other expenses of the appraisal and umpire equally.
>
> In no event will an appraisal be used for the purpose of interpreting any policy provision, determining causation or determining whether any item or loss is covered under this policy. If there is an appraisal, we still retain the right to deny the claim.

J.A. 75 (emphasis added). Rike and First Protective picked their appraisers, who both selected John Robison to serve as umpire if they couldn't agree on an appraisal value. Even so, the umpire's valuation was mostly provisional, since First Protective was not obligated to pay the claim after the umpire's valuation. But Robison recused himself once he learned that Rike had chosen him as her appraiser for a separate claim for alleged damage to her property caused by Hurricane Florence.

Enter Lewis O'Leary.[1] O'Leary is a consultant for policyholders embroiled in insurance disputes. First Protective didn't know it, but O'Leary was "actively serving as a paid consultant to Rike" on at least one pending claim against a different insurer. J.A. 16. Evidently O'Leary did not share Robison's scruples, and no one—including O'Leary—disclosed these relationships to First Protective. Nevertheless, Rike proposed O'Leary to replace Robison as umpire, and O'Leary agreed that he would be "strictly impartial." J.A. 14–15.

About a month after O'Leary became the umpire, the appraisers called in his services. Over the next eleven months the two appraisers and O'Leary deliberated over the valuation of the loss from the water leak. In the end, O'Leary appraised the damage at $1,036,000. Rike's appraiser signed the appraisal award, but First Protective's appraiser refused, since the award nearly quadrupled Rike's original $236,619.80 estimate.

---

[1] We refer to both defendant-appellants as "O'Leary," since O'Leary is alleged to be the "principal owner, officer, director and registered agent for" defendant ProBuilders of the Carolinas, Inc. J.A. 10.

4

Feeling it had been taken for a ride, First Protective sued multiple defendants in the United States District Court for the Eastern District of North Carolina. Against O'Leary and his company, ProBuilders of the Carolinas, First Protective pled violations of North Carolina's Unfair and Deceptive Trade Practices Act and tortious interference with contract. It also sought declaratory judgments that O'Leary had a conflict of interest that invalidated the appraisal award and that O'Leary made improper coverage and causation determinations.

O'Leary moved for judgment on the pleadings, arguing that he was immune from civil liability under the North Carolina Revised Uniform Arbitration Act (the "Act"). In a thorough opinion, the district court denied this motion, concluding that the Act's immunity provisions don't apply to umpires like O'Leary. O'Leary then filed this interlocutory appeal.[2]

---

[2] The district court had diversity jurisdiction under 28 U.S.C. § 1332 because the lone plaintiff both here and below—First Protective—is a citizen of Florida seeking $1,036,000, while the defendants below are citizens of North Carolina, Tennessee, or Oklahoma. Our colleague in dissent points out a circuit split on whether we must resolve issues of statutory appellate jurisdiction—as we must with constitutional jurisdictional issues—before proceeding to the merits, and claims that *Kale v. Alfonso-Royals*, 139 F.4th 329, 336 n.3 (4th Cir. 2025) says we must. But *Kale* held that the Immigration and Nationality Act deprives courts of jurisdiction over challenges to the United States Immigration Citizenship Service's decisions in administering green cards. *Kale*, 139 F.4th at 334. Although the opinion certainly contains the hypothetical jurisdiction language on which the dissent relies, the parties in *Kale* did not brief that issue and the language "could have been deleted without seriously impairing the analytical foundations of the holding." *City of Martinsville, Va. v. Express Scripts, Inc.*, 128 F.4th 265, 271 n.5 (4th Cir. 2025); *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998) ("We have often said that drive-by jurisdictional rulings of this sort (if *Gwaltney* [*of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 64 (1987)] can even be called a ruling on the

## II.

Arbitral immunity is a matter of North Carolina law. The Act grants immunity to arbitrators, but it applies only to arbitration agreements. N.C. Gen. Stat. § 1-569.3(a)–(b). O'Leary does not argue that such an agreement exists here. So, the Act itself does not grant O'Leary immunity.

But the Act makes no claims to exclusivity. Indeed, it merely "supplements any immunity under other law." N.C. Gen. Stat. § 1-569.14(b). O'Leary says this "other law" includes *Dalenko v. Collier*, 664 S.E.2d 425 (N.C. Ct. App. 2008). There, the court held that "[w]hether a private citizen is clothed with judicial immunity is based on a functionality test." *Id.* at 430. The court didn't describe the functionality test, but it cited *Burns v. Reed,* 500 U.S. 478, 500 (1991) (Scalia, J., concurring in part and dissenting in part), which notes that "the touchstone for [judicial immunity's] applicability was performance of the function of resolving disputes between parties, or of authoritatively adjudicating private rights." The *Dalenko* court then held that because Collier "was sitting as an arbitrator to resolve a dispute pending in the courts of Wake County," he was entitled to immunity. *Dalenko*, 664 S.E.2d at 431.

First Protective argues that O'Leary forfeited this functionality test argument by making it only perfunctorily below, and by failing to raise immunity as an affirmative

---

point rather than a dictum) have no precedential effect."). Thus, with respect for *Kale* and without questioning its correctness, that language appears to be dicta. Therefore, we would not address this question that has divided our colleagues from other circuits on a murky issue of state law immunity.

defense in his answer. But since the district court addressed O'Leary's functionality argument, any related preservation errors are beside the point. *See Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 305–06 (4th Cir. 2006) ("We are not [] precluded from considering an affirmative defense that was not properly asserted in the trial court, if the court has nonetheless chosen to address it.").

Even so, O'Leary never explains how he satisfies the functionality test. Indeed, the district court persuasively explained the differences between what an arbitrator does and what O'Leary did. While Collier settled a dispute as contemplated by an explicit arbitration agreement in *Dalenko*, O'Leary did not settle any disputes or adjudicate private rights. He merely determined an appraisal amount when two appraisers disagreed. And, notably, it is undisputed that First Protective was not obliged to pay the amount determined by O'Leary. Because O'Leary merely determined the amount of property loss, he cannot satisfy the functionality test.

The district court's decision follows North Carolina law. In *N.C. Farm Bureau Mut. Ins. Co. v. Sadler*, 711 S.E.2d 114, 115 (N.C. 2011), an insurance company sought to invalidate an appraisal award determined by an umpire in an identical process to the one here. Noting that the insurer had no obligation to pay the appraisal award's amount, the court summed up that "the policy's appraisal process is limited to a determination of the amount of loss and is not intended to interpret the amount of coverage or resolve a coverage dispute." *Id.* at 117 (citing 15 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance 3d* § 210:42 (Dec. 1999) for the proposition that "[a]s a general rule, the sole purpose of an

7

appraisal is to determine the amount of damage. . . . An appraisal does not necessarily determine the total amount due under the policy.").

Also, in *PHC, Inc. v. N.C. Farm Bureau Mut. Ins. Co.*, 501 S.E.2d 701, 702 (N.C. Ct. App. 1998), the court addressed whether the Act applied where "an automobile insurance policy provide[d] an appraisal procedure for determining the value of an insured plaintiff's collision loss to his vehicle, and the amount of loss to the vehicle is determined through that procedure." Just as here, the two appraisers chose an umpire. *Id.* at 702–03. The court held the umpire was not an arbitrator.

> None of the persons determining the amount of the loss are referred to as arbitrators, nor are the provisions of the Uniform Arbitration Act even obliquely mentioned. Most persuasive is the reservation by the Insurance Company of the right to deny the claim even after submitting the amount of loss for appraisal. The appraisal provisions of the insurance policy merely provide a mechanism whereby the parties can rapidly and inexpensively determine the amount of property loss without resorting to court process . . . [Thus,] the procedure set out in the policy of insurance is not arbitration within in the meaning of the Uniform Arbitration Act[.]

*Id.* at 703. Thus, *Sadler* and *PHC* make clear that under North Carolina law, umpires do not enjoy the same immunity as arbitrators.[3]

For these reasons, we affirm the district court's denial of O'Leary's motion for judgment on the pleadings. We also affirm the district court's related denial of O'Leary's motion for a protective order precluding discovery and his motion for attorney's fees. And we remand for further proceedings consistent with this opinion.

---

[3] First Protective argues that arbitrators enjoy only immunity from liability, not absolute immunity from suit. We need not decide that issue because whatever level of immunity North Carolina law affords to arbitrators, it does not apply to umpires.

9

*AFFIRMED AND REMANDED*

GREGORY, Circuit Judge, dissenting:

In my view, we lack jurisdiction to hear this appeal. Having determined that we possess constitutional jurisdiction, the majority side-steps the question of statutory jurisdiction by *assuming* that we possess it. Maj. Op. at 5 n.2. But I believe the majority's decision to assume statutory jurisdiction violates the Supreme Court's and this Court's precedent and threatens the Constitution's careful balance of powers between the branches. Before reaching the merits, we *must* conduct a full jurisdictional inquiry. I believe we do not possess jurisdiction over this interlocutory appeal and would dismiss this appeal regardless of my views on the merits. Thus, I must respectfully dissent.

I.

Today, the majority attempts to join a disturbing trend of courts assuming statutory jurisdiction, a practice sometimes referred to as "hypothetical jurisdiction." *See Waleski v. Montgomery, McCracken, Walker & Rhoads, LLP*, 143 S. Ct. 2027, 2027 (mem.), *reh'g denied*, 144 S. Ct. 53 (2023) (Thomas, J. dissenting from the denial of cert.). As explained by these courts, if the merits question is easy but the statutory jurisdictional question is hard, courts may skip the jurisdictional analysis and proceed to the merits so long as the end result is the same—a ruling against the plaintiff. *Id*. There is an "entrenched Circuit split" on the validity of this practice, but we have already staked our position: as we explained, "[i]n our view, the Supreme Court has expressly foreclosed this avenue." *Kale v. Alfonso-Royals*, No. 23-1799, 2025 WL 1561700, at *3 n.2 (4th Cir. June 3, 2025) (quoting *Waleski*, 143 S. Ct. at 2028 (Thomas, J. dissenting from the denial of cert) and

citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93–95 (1998)). Not only is *Kale* binding, it is correct.[1]

As *Kale* correctly points out, this question begins and ends with the Supreme Court's decision in *Steel Co.* There, the Supreme Court considered the question of hypothetical jurisdiction and squarely rejected the practice. "Recalling 'a long and venerable line of our cases,' *Steel Co.* reiterated: 'The requirement that jurisdiction be established as a threshold matter is inflexible and without exception,' . . . for 'jurisdiction is power to declare the law,' and 'without jurisdiction the court cannot proceed at all in any cause.'" *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 577 (1999) (quoting *Steel Co.*, 523 U.S. at 94–95) (cleaned up). "Hypothetical jurisdiction," the Court explained, "produces nothing more than a hypothetical judgment—which comes to the same thing as

---

[1] The majority disregards *Kale*, labeling its holding as mere "dicta." Maj. Op. at 5 n.2. It is not. As we have explained, "[d]ictum is a statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding." *City of Martinsville, Va. v. Express Scripts, Inc.*, 128 F.4th 265, 271 n.5 (4th Cir. 2025) (cleaned up); *see also Payne v. Taslimi*, 998 F.3d 648, 654–55 (4th Cir. 2021) ("Dictum is a statement in a judicial opinion . . . that, being peripheral, may not have received the full and careful consideration of the court that uttered it.") (cleaned up). In other words, "[i]f necessary to the outcome, a precedent's reasoning must be followed." *Id.* at 655.

*Kale*'s rejection of the hypothetical statutory jurisdiction was a core part of our final disposition of the case—dismissal for lack of jurisdiction. 2025 WL 1561700 at *1. Indeed, the entire opinion was about jurisdiction. If we had simply assumed jurisdiction as the majority does here, we would not have dismissed the case for lack thereof and, instead, would have turned to the merits. *Id.* at *3 n.2. And it can hardly be said that the Court made this utterance without careful consideration. We explicitly noted and rejected the First Circuit's approach of assuming jurisdiction in the same context. *Id.* (discussing *Gupta v. Jaddou*, 118 F.4th 475, 482 (1st Cir. 2024)). *Kale*'s rejection of hypothetical statutory jurisdiction was no throw-away line—it was key to the case's final disposition. It cannot be tossed aside as dicta.

11

an advisory opinion, disapproved by this Court from the beginning." *Steel Co.*, 523 U.S. at 101. *Steel Co.*, in my mind, is the end of the matter: we must decide all jurisdictional questions before turning to the merits and we may not assume jurisdiction.

The majority and some of our sister circuits have attempted to limit *Steel Co.* to only questions of constitutional, and not statutory, jurisdiction. *See Waleski*, 143 S. Ct. at 2027 (Thomas, J. dissenting from the denial of cert) (gathering cases). But *Steel Co.* cannot be read so narrowly. *See Friends of the Everglades v. U.S. EPA.*, 699 F.3d 1280, 1288 (11th Cir. 2012). Rather, *Steel Co.* defined subject matter jurisdiction as "the courts' *statutory or constitutional power* to adjudicate the case." 523 U.S. at 89 (emphasis added). Since *Steel Co.*, this definition of jurisdiction has become "well established." *B.R. v. F.C.S.B.*, 17 F.4th 485, 492 (4th Cir. 2021) (citing *Steel Co.*, 523 U.S. at 89). Looking beyond *Steel Co.*'s definition, "[n]othing in [the case's] . . . holding suggests that limitations on subject-matter jurisdiction are less binding when created by statute rather than by the Constitution." *Butcher v. Wendt*, 975 F.3d 236, 247 (2d Cir. 2020) (Menashi, J. concurring in part).

Nor has subsequent precedent narrowed *Steel Co.*'s holding. Instead, the Supreme Court has consistently reiterated that courts "may not assume jurisdiction for the purpose of deciding the merits of the case," *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007), and "expressly affirmed that it is 'subject-matter jurisdiction'— not some subset of subject-matter jurisdiction, such as 'Article III jurisdiction,' . . . or 'constitutional' jurisdiction . . .—that must precede a decision on the merits," *Butcher*, 975 F.3d at 246–47 (Menashi, J. concurring in part) (discussing *Ruhrgas*, 526 U.S. at 584) (citations omitted); *see also Stop Reckless Econ. Instability Caused by Democrats v. Fed.*

12

*Election Comm'n*, 814 F.3d 221, 228 (4th Cir. 2016) ("the Supreme Court has stated in no uncertain terms that federal courts are not free to simply assume that they possess subject-matter jurisdiction and then proceed to decide the merits of the issues before them when their jurisdiction remains in doubt").

Applying *Steel Co.* to questions of statutory jurisdiction is also consistent with this Court's jurisprudence, and we have even relied on *Steel Co.* for the proposition that we *must* determine our statutory jurisdiction before turning to the merits. In *Kale*, we explained that "[e]ven in situations featuring difficult jurisdictional questions, we cannot 'assume' jurisdiction to instead resolve easier merits issues" and that "[w]e cannot proceed to the merits of any case before determining that we have jurisdiction." 2025 WL 1561700 at *3. *Kale* is hardly an aberration. In *Ameur v. Gates*, we cited *Steel Co.* for the proposition that we "must decide" the question of whether we have jurisdiction under 28 U.S.C. § 2241(e) before proceeding to the merits. 759 F.3d 317, 322 (4th Cir. 2014). Likewise, we held that *Steel Co.* requires us to first determine if we or the Federal Circuit has jurisdiction under 28 U.S.C. § 1338 before considering the merits. *Honeywell Int'l Inc. v. OPTO Elec. Co., Ltd.*, 135 F.4th 170, 175 (4th Cir. 2025) ("we *must* assess whether we have subject matter jurisdiction before we consider the merits") (emphasis added). In numerous other cases we have routinely noted that we must first ensure statutory jurisdiction before turning to the merits. *See, e.g., Coleman v. Kendall*, 74 F.4th 610, 615 (4th Cir. 2023), *cert. denied*, 144 S. Ct. 818 (2024) ("this Court must sua sponte evaluate whether jurisdiction is appropriate [under the Tucker Act]"); *AirFacts, Inc. v. de Amezaga*, 909 F.3d 84, 91 (4th Cir. 2018) ("we must first ensure that we have jurisdiction over this

13

appeal" under 28 U.S.C. § 1291); *Kporlor v. Holder*, 597 F.3d 222, 224 (4th Cir. 2010) ("we must resolve [the question of whether we have jurisdiction under 8 U.S.C. § 1252] before we can even consider the merits").

Just as *Steel Co.*'s language and subsequent caselaw give us no reason to distinguish between constitutional and statutory jurisdiction, neither does *Steel Co.*'s reasoning. *Steel Co.* rejected hypothetical jurisdiction because "such an approach . . . carries the courts beyond the bounds of authorized judicial action and thus offends fundamental principles of separation of powers." 523 U.S. at 94. But courts are bound by Congress just as they are bound by the Constitution. Indeed, "few, if any, precepts are more fundamental than that federal courts are courts of limited jurisdiction, constrained to exercise only the authority [1] conferred by Article III of the Constitution *and* [2] affirmatively granted by federal statute." *B.R.*, 17 F.4th at 492 (cleaned up) (emphasis added); *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (we "possess only that power authorized by Constitution and statute").[2] As a result, when we come across any "limits upon federal jurisdiction," regardless of whether they are "imposed by the Constitution or by Congress," we may "neither disregard[] nor evade[]" them. *Owen Equip. & Erection*

---

[2] There is a continuing debate over "[t]he exact confines of Congress's power over jurisdiction." *Appalachian Voices v. U.S. Dep't of the Interior*, 78 F.4th 71, 78 (4th Cir. 2023). For example, the Constitution confers some jurisdiction directly upon the Supreme Court, "of which the legislative power cannot deprive it." *United States v. Hudson*, 11 U.S. 32, 33 (1812); U.S. Const. Art. III, § 2, cl. 2. Congress also cannot deprive federal courts of jurisdiction to hear habeas claims without first following the strictures of the Suspension Clause. *See Boumediene v. Bush*, 553 U.S. 723, 771 (2008). Nonetheless, "[p]rovided it does not violate other constitutional provisions," Congress "enjoy[s] broad control over the jurisdiction of the federal courts." *Appalachian Voices*, 78 F.4th at 78.

14

*Co. v. Kroger*, 437 U.S. 365, 374 (1978). To do otherwise would disrupt the Constitution's careful balance.

Finally, the majority's decision to assume jurisdiction ignores our "'independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party.'" *Friedler v. Stifel, Nicolaus, & Co., Inc.*, 108 F.4th 241, 245 (4th Cir. 2024) (quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006)). This "rule, springing from the nature and limits of the judicial power of the United States is inflexible and without exception," *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982) (quoting *Mansfield, C. & L. M. R. Co. v. Swan*, 111 U.S. 379, 382 (1884)), and requires us "to ensure that we possess appellate jurisdiction" under 28 U.S.C. § 1291, *Est. of Cunningham v. Mayor of Baltimore*, 128 F.4th 238, 242 (4th Cir. 2025) (quoting *B.P.J. by Jackson v. W. Va. State Bd. of Educ.*, 98 F.4th 542, 552 (4th Cir. 2024), *cert. denied sub nom. WV Secondary Sch. Activities v. B. P. J.*, 145 S. Ct. 568 (2024)).[3]

In sum, I believe that we may not assume jurisdiction—whether statutory or constitutional. Before proceeding to the merits, we must affirmatively conclude that we have both Congress' and the Constitution's permission. At times, this may seem like a needless expenditure of judicial resources, especially in a case like this where the merits question is simpler than the jurisdictional one. But "[m]uch more than legal niceties are at stake here." *Steel Co.*, 523 U.S. at 101. This is because jurisdiction goes to our power and

---

[3] *See also Atkinson v. Godfrey*, 100 F.4th 498, 503 n.3 (4th Cir. 2024); *Conway v. Smith Dev., Inc.*, 64 F.4th 540, 544 (4th Cir. 2023); *Mitchell v. Maurer*, 293 U.S. 237, 244 (1934) ("An appellate federal court must satisfy itself . . . of its own jurisdiction.").

courts cannot, "for reasons of expedience, [] sidestep jurisdictional issues," *Va. Dep't of Corr. v. Jordan*, 921 F.3d 180, 187 (4th Cir. 2019).

## II.

I now turn to the question of jurisdiction in this matter. Invoking the collateral order doctrine, O'Leary seeks to appeal the district court's denial of his motion for judgment on the pleadings, indisputably an interlocutory order. Because this appeal does not implicate a "particular value of a high order" or a "substantial public interest," *see Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 107 (2009) (citations omitted), I would find the collateral order doctrine inapplicable and therefore hold that we lack jurisdiction to consider O'Leary's appeal.

As we have repeatedly explained, "[o]rdinarily, a district court order is not 'final' until it has resolved *all* claims as to *all* parties." *Est. of Cunningham*, 128 F.4th at 242 (quoting *Fox v. Balt. City Police Dep't*, 201 F.3d 526, 530 (4th Cir. 2000)) (emphasis in original). Here, the district court's denial of O'Leary's motion for judgment on the pleadings did not resolve any claim against any party. So, "[i]n this sense, the district court's order was clearly not a final decision." *McEvoy v. Diversified Energy Co. PLC*, 111 F.4th 330, 334 (4th Cir. 2024); *see also Occupy Columbia v. Haley*, 738 F.3d 107, 115 (4th Cir. 2013) ("Ordinarily, we do not possess appellate jurisdiction over interlocutory orders—such as . . . the denial of a Rule 12(c) motion for judgment on the pleadings.").

"Nonetheless, the Supreme Court has recognized the reviewability of 'a small class of collateral rulings that, although they do not end the litigation, are appropriately deemed

16

final.'" *McEvoy*, 111 F.4th at 334 (quoting *Mohawk Indus., Inc.*, 558 U.S. at 106) (quotations omitted). This is known as the collateral order doctrine. "If an order qualifies as a collateral order . . ., it is by its nature a final decision appealable under 28 U.S.C. § 1291." *Id.* at 335; *see also Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 867 (1994) (describing the collateral order doctrine not as an exception to the final decision rule, but as a "practical construction" of it).

Under the Supreme Court's decision in *Cohen v. Beneficial Indus. Loan Corp.*, "[t]o qualify a collateral order as 'final,' an appellant must demonstrate (1) that the order conclusively disposed of an issue in the litigation; (2) that the issue was 'independent' of the merits of the underlying claim; and (3) that the order could not 'effectively . . . be reviewed and corrected if and when final judgment results.'" *McEvoy*, 111 F.4th at 334 (quoting *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949)).

"[T]he importance of the right asserted on appeal has always been a significant part of the [*Cohen*] analysis." *Cobra Nat. Res., LLC v. Fed. Mine Safety & Health Rev. Comm'n*, 742 F.3d 82, 87 (4th Cir. 2014) (cleaned up). The Supreme Court explained "the decisive consideration is whether delaying review until the entry of final judgment 'would imperil a substantial public interest' or 'some particular value of a high order.'" *Mohawk Indus., Inc.*, 558 U.S. at 107 (quoting *Will v. Hallock*, 546 U.S. 345, 352–53 (2006)). In sum, collateral orders are "too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Will*, 546 U.S. at 349 (quoting *Cohen*, 337 U.S. at 546).

17

The Supreme Court and this Court have repeatedly emphasized that only a "small class" of cases fall within the collateral order doctrine, and that the collateral order doctrine "must never be allowed to swallow the general rule that a party is entitled to a single appeal, to be deferred until final judgment has been entered." *Mohawk Indus., Inc.*, 558 U.S. at 106 (cleaned up); *McEvoy*, 111 F.4th at 334. Indeed, this Court has acknowledged the Supreme Court's "persistent admonitions that a court of appeals should avoid creating new categories of interlocutory appeals under the collateral order doctrine." *Cobra Nat. Res., LLC*, 742 F.3d at 92 n.15. This is because "[p]ermitting piecemeal, prejudgment appeals . . . undermines efficient judicial administration and encroaches upon the prerogatives of district court judges, who play a special role in managing ongoing litigation." *Mohawk Indus., Inc.*, 558 U.S. at 106 (quotations and citations omitted). Therefore, "the conditions for collateral order appeal [are] stringent." *Digital Equip. Corp.*, 511 U.S. at 868.

A.

Here, the first two *Cohen* factors can be easily dispatched with: the district court's order is a conclusive determination, and the question of O'Leary's immunity is independent of the merits.

"[A] 'conclusive determination' means that the appealed order must be a 'complete, formal, and, in the trial court, final rejection of' the issue." *Belya v. Kapral*, 45 F.4th 621, 630 (2d Cir. 2022) (quoting *Abney v. United States*, 431 U.S. 651, 659 (1977)). The district court conclusively determined that O'Leary could not invoke North Carolina's arbitrator immunity, *see* J.A. 143, satisfying the first *Cohen* factor.

18

"As to the second [*Cohen*] prong, an order resolves important questions independent from the merits when the questions involve a 'claim of right separable from rights asserted in the action.'" *Belya*, 45 F.4th at 630 (quoting *Cohen*, 337 U.S. at 546) (cleaned up). "An order is only collateral to the merits of a case if it does not involve considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Cobra Nat. Res., LLC*, 742 F.3d at 90 (cleaned up). The question of immunity is separate from the merits of the case and courts have routinely found that cases presenting questions of immunity satisfy *Cohen* requirements. *See e.g.*, *Will*, 546 U.S. at 351–52; *Childs v. S.D. Fam. Hous. LLC*, 22 F.4th 1092, 1096 (9th Cir. 2022) (the denial of immunity is "an important issue separate from the merits of the action."). So, like the first factor, the second is also clearly satisfied.

## B.

This case turns on the resolution of the third *Cohen* factor. Because the order can "effectively [] be reviewed and corrected if and when final judgment results," *Cohen*, 337 U.S. at 546, the collateral order doctrine is not satisfied.

### i.

As a threshold matter, when evaluating the appealability of denials of immunity, one "'critical question'" is whether the claimed right "constitutes an immunity from suit" or is a "defense to liability." *Al Shimari v. CACI Int'l, Inc.*, 679 F.3d 205, 214 (4th Cir. 2012) (quoting *Van Cauwenberghe v. Biard*, 486 U.S. 517, 524 (1988)). To answer this question, we look to state law. *See Nero v. Mosby*, 890 F.3d 106, 122 (4th Cir. 2018). If the claimed right is immunity from suit, we may have jurisdiction, but, if it is only a defense

19

to liability, we categorically do not. *See Digital Equip. Corp.*, 511 U.S. at 871; *Gray-Hopkins v. Prince George's Cnty.*, 309 F.3d 224, 231 (4th Cir. 2002). I believe that the North Carolina Arbitration Act—the statute under which O'Leary seeks immunity—grants immunity from suit.

The Act reads: "An arbitrator or an arbitration organization acting in that capacity is immune from civil liability to the same extent as a judge of a court of this State acting in a judicial capacity." N.C. Gen. Stat. § 1-569.14(a). This provision "codif[ies] judicial immunity for arbitrators." *Dalenko v. Collier*, 664 S.E.2d 425, 430 n.2 (N.C. App. 2008).

As we have explained, "[j]udicial immunity is strong medicine . . . . It not only protects judges from ultimate liability in a case, but also serves as a complete bar to suit." *Gibson v. Goldston*, 85 F.4th 218, 223 (4th Cir. 2023). North Carolina courts agree. *Bare v. Atwood*, 693 S.E.2d 746, 750 (N.C. App. 2010) ("Judicial immunity is an absolute immunity from suit, not merely from an ultimate assessment of damages."); *Wynn v. Frederick*, 895 S.E.2d 371, 380 (N.C. 2023), *reh'g denied*, 896 S.E.2d 254 (N.C. 2024). By codifying judicial immunity for arbitrators, North Carolina's legislature granted them the same level of protection.[4]

---

[4] The legislative history of the Act further reinforces this conclusion. In enacting these provisions, North Carolina drew from the Uniform Arbitration Act § 14. *Compare* N.C. Gen. Stat. § 1-569.14 *to* Nat'l Conf. of Comm'rs on Unif. State Laws, Unif. Arb. Act § 14 (last revised 2000). In its commentary, the Uniform Law Commission explained that this section is "intended" to provide arbitrators "full immunity from any civil proceedings." Unif. Arb. Act § 14 cmt. 1.

ii.

While immunity from suit is "necessary" for the invocation of the collateral order doctrine, it is not "sufficient." *Digital Equip. Corp.*, 511 U.S. at 871; *see also Childs*, 22 F.4th at 1096 (noting "the Supreme Court has declined to derive a rule that the denial of any type of immunity from suit is immediately appealable."). In determining whether "orders denying an asserted right to avoid the burdens of trial qualify [] as orders that cannot be reviewed effectively after a conventional final judgment," courts must consider "the value of the interests that would be lost through rigorous application of a final judgment requirement." *Will*, 546 U.S. at 351–52 (cleaned up). The test for interlocutory review "is not mere avoidance of a trial, but avoidance of a trial that would imperil *a substantial public interest*." *Id.* at 353 (emphasis added). Because private arbitrator immunity does not implicate a substantial public interest, I would hold that the third *Cohen* factor is not satisfied and that, therefore, we lack jurisdiction.

The Supreme Court has catalogued examples of values of a substantial public interest sufficient to support interlocutory review. *See id.* at 352 (collecting cases). For example, it has held that the collateral order doctrine applies to denials of the President's absolute immunity, denials of qualified immunity, denials of Eleventh Amendment state sovereign immunity, and double jeopardy claims. *Id.* These immunities implicate a substantial public interest because they are designed to "honor[] the separation of powers, preserv[e] the efficiency of government and the initiative of its officials, respect[] a State's dignitary interests, and mitigat[e] the government's advantage over the individual." *Id*. at

21

352–53. Relying on these cases, this Court has held it has jurisdiction to consider a collateral order involving judicial immunity. *See Gibson*, 85 F.4th at 223.

But simply because there is a substantial public interest in preserving judicial immunity does not mean that there is necessarily a substantial public interest in preserving *private arbitrator's* immunity. In other contexts, courts have distinguished between assertions of immunity by government entities and by private parties. For example, the Fifth Circuit held that while the collateral order doctrine applied to denials of *Parker* immunity to *public* entities, it did not extend to interlocutory appeals of the denial of *private* entities' *Parker* immunity. *Acoustic Sys., Inc. v. Wenger Corp.*, 207 F.3d 287, 293–94 (5th Cir. 2000).[5] The court explained that the collateral order doctrine applied to state entities' *Parker* immunity because it protected the same interests as public officials' absolute and qualified immunity and states' Eleventh Amendment immunity, all of which implicate the collateral order doctrine. *Id.* But the Fifth Circuit held that cases involving private defendants do not "implicate these concerns." *Id.* at 293. Relying on *Acoustic Systems*, the Tenth Circuit reserved the question of applying the collateral order doctrine to public entities' invocations of *Parker* immunity but held that "[e]xtending the collateral order doctrine to *private parties* contesting an order denying *Parker* immunity does not serve a substantial public interest." *Auraria Student Hous. at the Regency, LLC v. Campus Vill.*

---

[5] *Parker* immunity, also known as the state action doctrine, derives from the Supreme Court's decision in *Parker v. Brown*, 317 U.S. 341 (1943). *Parker* ensures states have immunity from antitrust suits. *See Acoustic Sys., Inc.*, 207 F.3d at 292. Gradually, courts have "extended the state action doctrine to cover, under certain circumstances, acts by private parties that stem from state power or authority." *Id.* (quotations and citation omitted).

22

*Apartments, LLC*, 703 F.3d 1147, 1153 (10th Cir. 2013) (emphasis added).[6] As these cases demonstrate, simply because we have extended the collateral order doctrine to *public* officials' immunity, we do not necessarily have to extend the same to *private* entities' invocations of parallel immunities. So, our holding on judicial immunity does not bind us here and we must continue the substantial public interest analysis.

Turning to the heart of the matter, I would hold that private arbitrator immunity does not implicate the same interests as judicial immunity—or any of the other forms of immunity that warrant the invocation of the collateral order doctrine. It is true that, like judges, arbitrators should engage in "principled and fearless decision-making." *Meek v. Cnty. of Riverside*, 183 F.3d 962, 965 (9th Cir. 1999). But—while certainly important— the consequences of a private arbitrator failing to fulfill his role are far less fatal to the integrity of a judicial system than an Article III or a state court judge who does the same. This is because arbitration lies outside the traditional judicial system not within it. Furthermore, by definition, arbitration only pertains to contractual disputes in which all parties have agreed to arbitrate. While judges routinely face questions involving the deprivation of life, liberty, and property, arbitrators tend to primarily face questions of the proper allocation of property. Though certainly important, the independence of an

---

[6] The Fourth Circuit, however, has held that—regardless of the party seeking immunity—"the . . . refusal to extend *Parker* protection to the [defendant] cannot be a collateral order." *S.C. State Bd. of Dentistry v. FTC*, 455 F.3d 436, 443 (4th Cir. 2006). The Fourth Circuit based this holding on the second *Cohen* factor, finding "the *Parker* analysis is not separable from the merits of this action." *Id.* Nonetheless, the Fifth and Tenth Circuits' discussions of the doctrine emphasize the distinction that courts have drawn between orders involving private and public parties.

arbitrator does not rise to the same level of public importance as the independence of a judicial officer.

Furthermore, unlike the forms of immunity the Supreme Court has recognized as grounds for interlocutory appeal, arbitration concerns the privileges of private parties, not of government entities. In *Garrick v. Moody Bible Inst.*, the Seventh Circuit declined to extend the collateral doctrine when the case before it "implicate[d] only private parties." 95 F.4th 1104, 1115 (7th Cir. 2024). Because "[n]o public officials or unit of government [was] involved," the case did not implicate many of the interests that have been found to support application of the collateral order doctrine, namely "the separation of powers, the dignity interest of a State, [and] the efficient operation of the government." *Id.* at 1115–16 (quotations and citation omitted). The Seventh Circuit did not, however, go so far as to find that the collateral order doctrine was *never* implicated in suits involving private entities, *id.* at 1116 n.8, and neither would I. But, unlike in cases where courts *have* allowed private parties to file an interlocutory appeal, arbitrator immunity does not "mitigat[e] the government's advantage over the individual." *Will*, 546 U.S. at 352–53.[7]

---

[7] The *Garrick* dissent argues that the collateral order doctrine "regularly" protects private parties' interests. 95 F.4th at 1123 n.7 (Brennan, J. dissenting). But, the two cases it cites in support are both related to criminal proceedings. *See id.* The first, *Abney v. United States*, held that a criminal defendant can appeal an interlocutory order denying a motion to dismiss an indictment on double jeopardy grounds. 431 U.S. 651, 659–60 (1977). The second, *Sell v. United States*, held that a criminal defendant could appeal an interlocutory court order requiring him to involuntarily receive antipsychotic medication. 539 U.S. 166, 175–77 (2003). While these cases do pertain to private individuals, they involve the constitutional rights of criminal defendants and, as such, implicate important public interest concerns distinct from cases solely between private parties.

24

The fact that O'Leary may be required to expend money on defending against the suit does not rise to the level of a substantial public interest. This Court has also held that concerns about "[private parties'] economic interests do not begin to approach the importance of several interests . . . that the Supreme Court has deemed insufficient [to satisfy the collateral order doctrine]." *Cobra Nat. Res., LLC*, 742 F.3d at 92. And the North Carolina legislature has enacted additional mitigating measures to protect arbitrators from vexatious litigation: it allows improperly sued arbitrators to recoup attorneys' fees and litigation costs. *See* N.C. Gen. Stat. § 1-569.14(e). This fee-shifting provision ameliorates the need to financially protect arbitrators from defending a suit.

\* \* \*

In all, arbitrator immunity does not rise to the level of a substantial public interest requiring interlocutory review, and expanding the collateral order doctrine to private arbitrator's claims of immunity "would constitute precisely the type of expansion the [collateral order] doctrine discourages." *Auraria Student Hous. at the Regency, LLC*, 703 F.3d at 1153. Therefore, the third and final *Cohen* factor is not satisfied and this Court lacks jurisdiction to consider the appeal. Without jurisdiction, we cannot opine on the merits. *Brownback v. King*, 592 U.S. 209, 218 (2021) ("a court cannot issue a ruling on the merits when it has no jurisdiction because to do so is, by very definition, for a court to act ultra vires.") (cleaned up).

25

III.

Because I believe that we do not possess jurisdiction in this case, I would dismiss this appeal for lack of jurisdiction rather than reach the merits. *See Ameur*, 759 F.3d at 332 ("Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining . . . is that of announcing the fact and dismissing the cause.") (quoting *Steel Co.*, 523 U.S. at 94). For that reason, I respectfully dissent.